GUTTNER et al. v. PACIFIC STEAM WHALING CO.

(District Court, N. D. California. August 29, 1899.)

No. 11,730.

1. SHIPPING—CONVERSION OF SHIP'S STORES—POSSESSION WHICH WILL SUPPORT ACTION.

Seamen who remained on board an ice-bound vessel after she had been abandoned by the master and others of the crew were lawfully in possession of the stores and other property on board belonging to the owners, and may maintain trespass therefor against the owners of another vessel, which took such stores and property off the vessel without their consent.

2. SAME—WRONGFUL TAKING.

The taking of such stores was none the less a trespass because no resistance was offered, and no force used, where it was without the consent of those in possession; nor is it any defense to the action that they were taken to preserve the lives of the crew of the vessel taking them.

3. SAME—MEASURE OF DAMAGES—INTEREST OF PLAINTIFF.

In an action to recover for the wrongful taking and conversion, by a stranger to the title, of property which was in the rightful possession of plaintiff, the measure of damages is the full value of the property converted, and defendant cannot limit the recovery to the value of the plaintiff's interest therein.

4. SAME—TORTS OF MASTER—LIABILITY OF OWNERS.

The masters of two whaling ships, together with natives living on shore, took from an ice-bound vessel, without the consent of those in charge, certain provisions, which were divided between the ships, and also whaling gear, and other articles, which were kept by the natives. Held, that the owners of one of the ships could only be held liable for the value of such of the stores taken as were applied to the use and benefit of their vessel, and which it would have been within the scope of the master's employment to procure. The fact that the master consented to the taking of the other property by the natives cannot render his principals liable therefor.

D. T. Sullivan, for libelants.
Page, McCutchen & Eells, for respondent.

DE HAVEN, District Judge. This is an action for a marine trespass and conversion. The libel charges that in the month of October, 1897, one Leavitt, master of the whaling bark Newport, owned by the defendant, took by force from the bark Navarch, then on the high seas, certain provisions, ship's gear, whaling gear, tools, and other articles of which the libelants were then lawfully possessed as of their own property. The defendant, in its answer, admits the taking of certain provisions at the time and place stated in the libel, but denies that the libelants, or any of them, were lawfully possessed of the property so taken, and also puts in issue the allegation of the libel that any provisions, stores, or other articles of personal property were taken by force and against the will and consent of the libelants; and for a separate defense it is alleged that it was necessary for the master of the bark Newport to take the provisions mentioned in the libel for the use of the crews of the Newport and other whaling vessels ice-bound in the Arctic Ocean at that time, and for the preservation of human life.

1. The facts of the case may be very briefly stated as follows: The libelants were seamen on board the steam whaling bark Navarch, and on August 5, 1897, that vessel was ice-bound in the Arctic Ocean, and, though staunch and strong, was then abandoned by her master and all of her crew, it being thought that she was in the Northwest current, and such action necessary for the safety of those on board. They were unable to make land, and, after being five days upon the ice, returned to the ship, and there remained four days, when her master and all of the crew except the libelants and three other persons again abandoned her, and started for the United States steamer Bear, then in sight, and only a few miles distant. The libelants refused to leave the Navarch at this time, for the reason that in their opinion it was more dangerous to go upon the ice than to remain; and it is possible they may have thought, or some of them, at least, that, if the vessel was finally saved, they would be entitled to compensation as salvors if they continued with her. None of them, however, knew anything about navigation, nor were they ever called upon to exercise any skill as navigators, as the Navarch drifted with the ice until the latter part of September, when she was sighted about 12 miles from Point Tangent by the Newport and the Fearless. These last-named vessels were lying ice-bound in a position of safety, about one-quarter of a mile from shore, and out of the current. They were only provisioned for six weeks, and therefore in need of additional supplies to subsist their crews until they could be released from the ice the following summer; and when the Navarch was sighted an officer from each, and a number of natives with sleds, were at once sent out to her, for the purpose of obtaining such stores and provisions as could be spared, and also to assist her crew in coming to the vessels in shore, if they desired so to do. This party succeeded in reaching the Navarch, and the sleds were, with the consent of the

libelants, loaded with supplies, all of which were lost upon the return trip on the ice; and the masters of the Newport and Fearless then determined to bring in all of the stores remaining upon the Navarch. This action was deemed necessary by them, because their vessels did not have sufficient provisions for the winter, and also because the Navarch was in a position of extreme peril and already abandoned by her master and most of the crew. In order to bring in the provisions, it was necessary to secure the assistance of natives with their sleds, and, for the purpose of inducing them to assist in this work, the natives were told that they might keep for themselves all of the whaling gear, sails, and tools which they might save from the Navarch. This was satisfactory to them; and under the direction of two officers, one from the Newport and one from the Fearless, they proceeded with sleds to the Navarch, and brought in all of her provisions, some whaling gear, a number of sails, and other articles. The provisions were placed on board the Newport, and less than one-half was retained by Capt. Leavitt for the use of that vessel, and the remainder divided between the Fearless and the steamer Jennie. The other articles were taken by the natives, with the exception of one hawser and two lengths of hose, which were retained on the Newport, and a steam pump and two sails, purchased by the master of the Fearless from one of the crew of the Navarch, who is not a libelant. The provisions divided between the Newport, Fearless, and Jennie were of the value of $871, and it is claimed by the libelants that the whaling gear and other articles kept by the natives were of the value of $2,900, or thereabouts. Whether this property was taken from the Navarch with the consent of the libelants will be considered in another part of this opinion.

2. It will be seen from the facts stated that the stores and other property taken from the Navarch belonged to the owners of that vessel. The libelants were, however, in lawful possession of the property at the time it was taken, and had the right to so continue as against every one except the true owner. The possession thus had was not the possession of servants, merely, and is sufficient to entitle the libelants to maintain this action as against the defendant, who has not shown a better title, if, in fact, the property was taken from them against their will and consent. Jefferies v. Railway Co., 5 El. & Bl. 802; Wheeler v. Lawson, 103 N. Y. 40, 8 N. E. 360; Stowell v. Otis, 71 N. Y. 36. In the case last cited it was said: "The peace and good order of society require that persons thus in possession of property, even without any title, should be enabled to protect such possession by appropriate remedies against mere naked wrongdoers." As already stated, the present case falls within this rule, if the property mentioned in the libel was taken by the master of the Newport from the libelants against their consent. Upon this question of fact the evidence is sharply conflicting, and it is not deemed necessary to attempt in this opinion any analysis of the testimony of the different witnesses, or to do more than state the conclusion reached upon this point. I think it sufficiently appears from the evidence that the libelants were not willing to let the stores on

the Navarch be taken from their possession, except upon condition of receiving a written acknowledgment to the effect that payment therefor should be made to whomsoever might thereafter be shown to be entitled to the property or its proceeds. They made a request for such a writing, and it was not given. In view of the fact that the provisions were necessary to supply those on board the imprisoned whaling ships with food during the approaching Arctic winter, and also because the Navarch was in a position of extreme peril, and everything on her almost certain to be lost unless removed, the libelants would have been justified in giving up the provisions upon the condition named, while a sale made by them upon their own account, with the intention of appropriating the proceeds to their own use, would have been an act of conversion. It is difficult to understand why this request was not complied with, except upon the supposition that the masters of the Newport and Fearless were of the opinion that the libelants had no interest in the property, and were not entitled to demand such a receipt; but, whatever may have been the reason for such action, the provisions were taken from the libelants without giving the acknowledgment or receipt requested. No actual violence was used, and no resistance offered by the libelants to make a resort to violence necessary to effect the taking. In my opinion, the facts which have been stated justify a finding that the property was taken without the consent of the libelants. The masters of the Newport and the Fearless had no right to take the provisions without giving the receipt requested, and their action, although the protest against it may have been feeble, was a trespass, a wrongful interference with the property, an unwarranted assumption of authority to take and deal with it upon terms not consented to by the libelants, who were lawfully in possession. Any unlawful interference by one with the property of another, or with property in the rightful possession of another, is a trespass upon such property, and the degree of force used is immaterial so long as what is done amounts to an exercise of dominion over it, against the will of the owner, or other person in lawful possession. Miller v. Baker, 1 Metc. (Mass.) 27; Gibbs v. Chase, 10 Mass. 125; Reynolds v. Shuler, 5 Cow. 323; Cooley, Torts, p. 448. Thus it has been held that, when a horse is hitched where he has a right to be, it is a trespass upon the part of another to unhitch and remove him against the will of the owner to another position, however near. Bruch v. Carter, 32 N. J. Law, 554. Nor is it any defense in this case that the property was taken from the possession of the libelants for the purpose of saving human life. The motive or intention with which a trespass upon property may have been committed is immaterial except in resisting a claim for exemplary damages on account of the trespass.

3. It having been shown that the libelants are entitled to maintain the action, the next question relates to the rule by which the damages are to be measured. It is very earnestly insisted in behalf of the defendant, that under the broad and equitable principles which govern proceedings in courts of admiralty, the libelants ought not to recover more than the value of their interest in the property which was taken by the defendant; and the proposition is also advanced,

that the value of this interest cannot, in any event, exceed what would have been allowed them as salvors, if they had actually brought the property to a place of safety and delivered it into the possession of the owners of the Navarch. It is undoubtedly true, as a general proposition, that damages, to be just, should be precisely commensurate with the injury for which they are given, and upon this principle it has been held that, when one having a special or qualified interest in property sues for its conversion, he can only recover, as against the general owner, or a defendant in privity with such owner, the value of such special interest. 1 Suth. Dam. 210; Chamberlin v. Shaw, 18 Pick. 278. But it is only in such cases that the courts permit any inquiry as to the value of a plaintiff's special interest in property wrongfully taken from his possession and converted by a defendant. Such an inquiry will not be made at the instance of a stranger, and that is the position occupied by the defendant in this case. The defendant here is not in privity with the owners of the Navarch or their successors in interest, and cannot justify the wrongful act of its agent, or mitigate the damages resulting therefrom, by interposing the title of the owners of the Navarch, or their successors, as a defense; and it results from this view that whether anything was done by the libelants for the preservation of the property converted by the defendant, of sufficient merit to entitle them, as against the owners of the Navarch, or their successors, to any part of the judgment to be recovered in this action, is a question not before the court at this time.

The measure of damages for the trespass and conversion complained of here is the same as that upon which courts act in awarding damages in common-law actions of trespass or trover, when property has been taken from the lawful possession of a plaintiff by one who is unable to show a better title; and under that rule the libelants are entitled to recover the full value of the property converted by the defendant. 1 Suth. Dam. 210; Armory v. Delamirie, 1 Strange, 505, 1 Smith, Lead. Cas. 636; Russell v. Butterfield, 21 Wend. 300; Harker v. Dement, 9 Gill, 7. This is the doctrine of the leading case of Armory v. Delamirie, just cited, in which it was held that the finder of a jewel was entitled to recover its full value in an action of trover against one who had taken it for examination, and refused to return it. It is not perceived that there is anything inequitable in this rule, or in its application to the present case, as the satisfaction of the decree herein will be a bar to another action by the true owner for the same conversion (Chesley v. St. Clair, 1 N. H. 189; Bissell v. Huntington, 2 N. H. 143; Bac. Abr. Tit. "Trover," par. 33); so that the defendant will only be required to pay the value of the property which it has converted, and, as a necessary result of giving such an effect to the decree, the libelants will be accountable to the owners of the Navarch for all that may be recovered in this action over and above the value of their own special interest, if any they have; and it will be provided in the decree that the money to satisfy the same shall be paid into court, so that the owners of the Navarch, or their successors in interest, may intervene in this proceeding for the protection of their rights at any time before the amount which the

defendant is required to pay shall come into the hands of the libelants. If they do not choose to intervene, and are satisfied to allow the libelants to retain for their own use the amount recovered in this action, that is a matter which does not concern the defendant, and of which it has no right to complain. What, then, should be the extent of the recovery against defendant upon the facts of this case? In my opinion, the libelants are entitled to recover the value of so much of the property tortiously taken by the defendant's agent, Capt. Leavitt, as was appropriated to the use and benefit of the Newport (The Florence, 2 Flip. 56, Fed. Cas. No. 4,880), and no greater sum. The defendant is only liable for the tort of the master of the Newport in so far as he was engaged in accomplishing a purpose within the general scope of his employment, and he was not clothed by the defendant with authority to secure whaling gear and other property for the natives, nor supplies for any other vessel than the one of which he was master. In Cooley, Torts, p. 536, in discussing the general question as to when the master is responsible for the wrongful act of his servant, it is said: "The test of the master's responsibility is not the motive of the servant, but whether that which he did was something his employment contemplated, and something which, if he should do it lawfully, he might do in the employer's name." Certainly, under this rule the court would not be justified in finding as a fact that the master of the Newport was acting within the scope of his employment in so far as he acted jointly with the natives, and with the master of the Fearless in taking from the Navarch supplies and other property not for the use of the Newport. If he had entered into a contract with the owners of the Navarch, for the purchase of all the property taken, they having notice that the purchase was made by him not only for the use of the Newport, but also for the use of the natives, and for the Fearless and the Jennie, such contract could not have been enforced as against the defendant, excepting in so far as it related to the property purchased for the Newport, because of want of authority in the master to bind the defendant beyond this; and so, when he joined with the other tort feasors in taking all the property from the Navarch, under the circumstances above stated, the defendant can no more be made liable for that portion of the property not taken for his use than if the master had procured such property by contract instead of tort. The proposition is not disputed that, when several persons unite in an act which constitutes a wrong to another, each one of them is liable for the entire damage resulting from the act of all; but this rule is not applicable when it is sought to hold a defendant responsible, not because of his actual participation in the wrong, but solely by virtue of the relation of principal and agent existing between him and one of the wrongdoers, when, as in this case, that which was done for the benefit of the principal, and in furtherance of the business intrusted to the agent, can be easily separated from that which was done by the agent for the benefit of others. The wrong complained of here was against personal property, consisting of different articles, and what was done by Capt. Leavitt in taking a portion of this property for the use of the Newport must, in this action against the defendant, be regarded as a tort separate and distinct from his wrong-

ful act in assisting to take at the same time the other property mentioned in the libel.

4. The libelants contend that the property kept by the natives was given to them by the masters of the Newport and Fearless as a compensation for services rendered to the defendant in bringing in the supplies, and that the defendant is therefore liable for its value as property applied to its use. The argument in support of this proposition is plausible, but is based upon an erroneous view of the real nature of the transaction. The natives and the masters of the Newport and Fearless were joint wrongdoers, and the agreement between them was, in effect, that the property taken should be divided, the provisions to be kept by the masters for the use of their vessels, and the whaling gear and other articles to be retained by the natives. The property retained by the natives under the division thus agreed upon cannot, in any legal sense, be considered as having been received by them from the master of the Newport as compensation for services rendered to the defendant; on the contrary, it was kept by them as their share of the property which they assisted in wrongfully taking from the Navarch. The fact that the master of the Newport consented to this disposition of the property is not sufficient to render the defendant liable for its value. The defendant was not an actual participant in the wrongful taking of any of the property belonging to the Navarch, and, as we have seen, is only liable for such portion thereof as was taken for the use of the Newport; and under this rule the defendant can no more be required to respond for the property wrongfully taken and kept by the natives for their own use than for the provisions taken for the use of the Fearless and the Jennie. I find the value of the property taken for the use of the defendant to be $150. Let a decree be entered in favor of the libelants for this sum and costs, the money to satisfy the decree to be paid into court.