Argued May 27, affirmed July 13, 1920.

## SMYTH *v.* KENWOOD LAND CO.

(190 Pac. 962.)

**Corporations—Dissolution—Action by Stockholder—Removal of Personal Property—Findings—Contract.**

1. In a stockholder's action, after dissolution, for damages to personal property belonging to the corporation, because of its removal by defendant from the premises sold by defendant to the corporation, after an alleged default in the sales contract, evidence *held* to support a finding that defendant had authorized such removal.

**Evidence—Corporation—Proclamation of Dissolution by Governor—Prima Facie Evidence.**

2. Where the Governor has issued a proclamation dissolving a corporation for failure to pay license fees for two years, under Sections 6716–6718, L. O. L., and Laws of 1913, page 670, Section

8, the recital of such proclamation that the corporation commissioner has filed a report of the delinquency of the corporation, constitutes *prima facie* evidence thereof, in view of Section 768, L. O. L.

### Corporations — Dissolution — Assets — When Stockholders Become Owners.

3. The property of a corporation, including rights of contract and choses in action, upon dissolution, becomes vested in the stockholders subject to the rights of creditors, and ordinarily and in the absence of debts the stockholders become the owners of the assets.

### Corporations—Dissolution—Pleading—Ownership by Stockholder.

4. In a stockholder's action for damages to personal property, brought after dissolution of the corporation, complaint, after verdict and in the absence of demurrer, *held* sufficiently to allege that plaintiff became, as stockholder, the sole owner of the corporation's property.

### Corporations—Land Sale Contract—Default—On Dissolution Passed to Stockholders.

5. A dissolved corporation's default under a land sale contract did not create a debt, existence of which prevented personal property of the dissolved corporation on the premises sold from passing to the stockholders, where the vendor elected to re-enter into possession.

### Corporations—Removing Property Before Right to Possession had Matured—Liability Enforceable After Dissolution by Stockholder.

6. Where a corporation defaulted under its contract to purchase realty, and the vendor failed to wait 60 days after default before re-entering into possession, as required by the contract, the acts of such vendor in removing the property of the corporation from the premises before its right to possession had matured *held* sufficient to create a basis for liability for damages to the corporation's property, enforceable by the plaintiff as a stockholder after dissolution.

From Multnomah: John P. Kavanaugh, Judge.

Department 1.

This is an action to recover damages for injuries to certain articles of personal property and for the destruction of other articles of personalty. The action was brought by Harry Howard, and he obtained a verdict and judgment against the Kenwood Land Company, and the defendant then appealed.

Howard died after the rendition of the judgment, and Sidney Smyth as administrator of Howard's estate, was substituted as the party plaintiff.

The Kenwood Land Company, the Pacific Gas Traction Company, and the Ajax-Auto-Traction Company, are corporations; but for convenience they will be referred to, respectively, as the Kenwood Company, the Gas Company, and the Ajax Company. The Pacific Coast Westrumite Company was a corporation until January 11, 1916, when it was dissolved by a proclamation of the Governor; and, for. the sake of brevity, this corporation will be designated as the Westrumite Company. The Oregon Wool Scouring Mills and the Pacific Coast Safe & Vault Works are corporations; and for convenience they will be mentioned, respectively, as the Wool Company and as the Safe Company.

On September 8, 1909, the Kenwood Company agreed in writing to sell to the Gas Company a tract of land embracing about 7 acres near Kenton, in Multnomah County. The Gas Company agreed to pay $3,000 per acre for the land. The purchase price was made payable on or before five years after September 8, 1909, the date of the instrument, with interest after November 1, 1909, at the rate of 6 per cent per annum payable semi-annually on November 1st and May 1st of each year. The Gas Company covenanted to pay the taxes on all improvements placed upon the land, while the Kenwood Company agreed to pay the taxes on the land until the delivery of the deed to the Gas Company. The contract contained a provision to the effect that if the Gas Company defaulted in the payment of interest or taxes, or failed to comply—

"in any respect with the agreements and promises herein contained on its part to be performed at the

time herein agreed, then the whole amount of said purchase price shall at once become due and payable and the party of the first part may demand payment thereof, with all arrearages of interest and taxes, if any there be, and on default or neglect by the said party of the second part for a period of sixty (60) days after such demand to pay the full amount of the purchase price with all arrearages, the party of the first part may, at its option, enter and repossess itself of the lands herein described and remove the party of the second part therefrom or may sue for and recover judgment against the party of the second part for the amount of the purchase price of the said lands with interest and taxes.''

At some time subsequent to September 8, 1909, the Gas Company assigned its interest in the land sale contract to the Ajax Company; and afterwards, on April 10, 1911, the Ajax Company assigned to the Westrumite Company its interest in the contract so far as it concerned a portion of the land, which portion was described by metes and bounds and contains 1.15 acres. The writing evidencing this assignment was signed by the Ajax Company and by the Westrumite Company; and by one of the provisions in the instrument the Westrumite Company agrees to pay to the Ajax Company the sum of $1,150—

''and further agrees to assume with relation to the one and fifteen hundredths (1.15) acre tract of land herein described all the obligations under the contract between the Kenwood Land Company and the Pacific Gas Traction Company, its successors and assigns, so far as the same equitably should apply to said one and fifteen hundredths (1.15) acre tract.''

Contemporaneously with the execution of the assignment to the Westrumite Company, the Kenwood Company in writing consented to the assignment by

the Ajax Company, and agreed to deed to the West-
rumite Company—

"the one and fifteen hundredths (1.15) acre tract of
land therein described when it shall comply with the
terms of the contract between said Kenwood Land
Company and the Pacific Gas Traction Company."

The Safe Company owned 1.44 acres adjoining the
tract embracing 1.15 acres; and the Westrumite
Company at the time when, or possibly before, it
acquired the assignment from the Ajax Company,
made an agreement with the Safe Company, for the
purchase of this tract of 1.44 acres.

George F. Heusner is the general manager, and
Warren Keeler is the auditor, of the Kenwood Com-
pany. Heusner owned most of the stock in the Safe
Company, and, for all practical purposes, was the
owner of that corporation. William Lind, Fred J.
Blakeley and Harry Howard owned all the Westru-
mite Company's stock outstanding on January 11,
1916, the date of the Governor's proclamation dis-
solving the Westrumite Company.

The Westrumite Company paid $3,000 when it re-
ceived the assignment from the Ajax Company.
While the defendant contends that it did not receive
any part of this sum, the plaintiff claims that the
Kenwood Company received $1,850 of the amount
paid by the Westrumite Company. Heusner says
that either Lind or Blakeley, acting for the Westru-
mite Company, paid $3,000 to him personally; but he
also states that $1,850 of the amount was "turned
over to" the Safe Company on account of the tract
of 1.44 acres, and that $1,150, the remainder, was
delivered to the Ajax Company, and that this distri-
bution of the money was approved by the representa-
tive of the Westrumite Company. The defendant

claims that the amount paid to the Ajax Company represents the profit made by the Ajax Company in the assignment, and that, since neither the Gas Company nor the Ajax Company had paid to the Kenwood Company any part of the principal, the whole of the principal of the purchase price amounting to $3,450 for the tract of 1.15 acres remained unpaid.

With the permission of the Kenwood Company, the Westrumite Company in November, 1910, a time prior to the execution of the assignment by the Ajax Company, began the erection of a building, 80x100 feet in size, and the installation of equipment used in the manufacture of westrumite, a product employed in paving roads and streets; and the Kenwood Company completed the improvements in May or June, 1911. The building together with docks and tracks constructed by the Westrumite Company cost about $15,000, and the machinery and fixtures cost about $20,000, making a total expenditure of $35.000 for improvements.

The Westrumite Company did some paving in 1911, and also in 1912; but it did no paving after the fall of 1912. In 1913 the Westrumite Company sold some material "to other paving companies"; and in 1914 nothing was done "except to try to sell the place." Lind testified that in 1915 he kept on trying to sell the interests of the Westrumite Company, and it may be added that there was evidence to show that attempts to sell the property were made in 1916, but without success.

The Wool Company had purchased a quantity of machinery which it desired to store until such time as it could secure a location for the installation of it; and with the permission of the Kenwood Company, the Wool Company in March or April, 1916, stored its machinery in the large building which had been

constructed by the Westrumite Company. The Wool Company arranged with the Kenwood Company to take over the property, including the buildings which had been used by the Westrumite Company, and then in the fall of 1916 the Wool Company began to assemble the machinery in the building, where it had been stored since the previous March or April. Inside this building there was a considerable quantity of equipment and material, including empty and filled barrels, tanks, metal flooring, and the like, all owned by the Westrumite Company. Before installing its machinery, the Wool Company removed all the barrels, tanks, metal flooring, machinery, and other equipment then in the building. Although it is to be inferred from the record that the Wool Company's contract with the Kenwood Company was dated November 1, 1916, nevertheless the record shows that the Wool Company began to remove the equipment and material on October 13, 1916.

After the Wool Company had occupied the premises and removed from the building the equipment and materials which had been placed there by the Westrumite Company, Lind and Blakeley assigned to Howard their interest in any right of action which the stockholders of the Westrumite Company might have against the Kenwood Company for entering the building and removing the property of the Westrumite Company. Howard brought this action against the Kenwood Company, alleging that without foreclosing the land sale contract, and without giving notice for a period of 60 days as provided for in the contract, the Kenwood Company wrongfully entered upon the premises and removed specified articles of property from the building, with the result that some of the property was damaged or destroyed in the process of removal, some was damaged by the ele-

ments, some carried away by floods, and some was stolen. In this connection it is proper to say that it is the theory of the plaintiff that the Kenwood Company is liable for whatever the Wool Company did with the property of the Westrumite Company.

Besides the denials, the answer avers that the Westrumite Company defaulted by failing to pay interest or taxes, or any of the principal due the defendant, and that on November 1, 1916, after more than 60 days' notice to the Westrumite Company, and to Howard, Lind, and Blakeley, the defendant entered into a contract for the sale of the 1.15 acres to the Wool Company, and that the Wool Company entered into possession of the land, and that "whatever property of the plaintiff was removed, the same was done by the Oregon Wool Scouring Mills, and not by this defendant."

In the reply the plaintiff admits that the Westrumite Company failed to pay interest and taxes, and failed to pay the principal due on the land sale contract; but the plaintiff further avers that the defendant excused and waived the defaults of the Westrumite Company, by receiving repayments of taxes after the same became due, by agreeing that payments on the purchase price might be made whenever the Westrumite Company should be able to make them, and by encouraging the Westrumite Company and its stockholders "to try to sell their interest in said premises."      AFFIRMED.

For appellant there was a brief over the names of *Mr. Robert B. Kuykendall, Messrs. Carey & Kerr* and *Mr. Omar C. Spencer,* with an oral argument by *Mr. Kuykendall.*

For respondent there was a brief over the names of *Messrs. Flegel, Reynolds, Flegel & Smith,* with an oral argument by *Mr. John W. Reynolds.*

HARRIS, J.—The defendant argues that the judgment should be reversed because: (1) There is no evidence to show that the injury to or destruction of any of the property was done by the Kenwood Company; (2) "there is no evidence of the dissolution of the Westrumite Company"; and (3) the plaintiff has not alleged or proved a cause of action in his favor, since there is neither allegation nor proof of the payment of the debts of the corporation. These three points are the only ones discussed in the printed brief submitted by the defendant, and consequently we shall confine our attention to these three points: *Miller Lumber Co.* v. *Davis,* 94 Or. 507 (185 Pac. 1107).

We may better understand the argument of the Kenwood Company, that there is no competent evidence connecting it with the injury and destruction of the property owned by the Westrumite Company, if we first state some additional facts shown by the record. As previously explained, the Westrumite Company was engaged in the manufacture of westrumite, and in laying pavement in 1911 and 1912. In 1913 the company did nothing except to sell some material it had on hand, and in 1914 the company "did not do anything, except to try to sell the place." In the language of Lind, in 1915, "we kept on trying to sell it right along." There is also evidence tending to show that attempts were made at different times in 1916 to bring about a sale of the plant. From and after 1914, and until the fall of 1916, when the Wool Company installed its machinery, the property was idle. There was not even a watchman,

although Lind visited the premises occasionally. Locks were placed on the doors and the building was closed. Lind testified that "we had the key to the property right along" until the Wool Company "came in" and removed "our lock" and took possession. The Westrumite Company never paid any taxes, except for the first year, and it never paid any interest, and it failed to pay any of the purchase price; and yet, notwithstanding these defaults, the Kenwood Company indulged the Westrumite Company most generously. The auditor says that "when the contract was first made, and interest periods would come around, I would send a notice to Mr. Lind, but he never paid any attention to it"; that after repaying to the Kenwood Company the amount of the taxes for the first year the Westrumite Company—

"paid no attention to any notice, and finally, after two or three years, I quit sending them, because I knew their condition was such that they could not pay anything."

Heusner explained that he made—

"every attempt that he could to pull them through, never oppressed them in any way * * I wanted to help them rather than injure them at all times."

Heusner also stated that "during all of this period of time up to the year 1916" he had indulged the Westrumite Company, and did not take any steps to terminate the contract, and that in each talk had with Lind—

"I would encourage him, tell him that we would not hurt him in any way, just to continue and see if he could not in some way rehabilitate himself with this, that, or the other."

Lind stated that he talked with Heusner and Keeler—

"about trying to get rid of it (the property), and of course they urged us in trying to get rid of it, but never crowded us, and said we had to pay it or get out, or anything of that kind, but always treated us nice that way, and gave us plenty of time to try to sell it."

Again, this witness testified that he would advise Heusner and Keeler "right along and talk about disposing of the place," and that they—

"said they would do all they could do for us to help us sell it, but as far as making any demand for money or telling us we had to do so and so to get the money, or get out, they never did."

However, after 1916, Lind, as president of the Westrumite Company, received from the Kenwood Company two letters, one of which was dated March 23d and the other October 14th. The March letter advised Lind:

"That unless your company can make arrangements to complete its contract on or before April 1st next your contract will be voluntarily surrendered. If you are unable to come through before that time, you are requested to remove from the premises, immediately after the above date, such material as may properly belong to you."

Keeler says that he saw Lind after the date of the March letter—

"and he still maintained that he had a prospect of selling, and so it dragged along week after week, waiting for them to arrive at some definite arrangement."

It also appears from the testimony of Keeler that when the Wool Company stored its machinery in the building in March or April, it did so under—

"arrangements * * to put the machinery in the building and leave it there until such time as the Westrumite Company would come through with their contract, or let go and get out"; and "the negotiations and uncertainty and talk with Lind lasted until October that same year"; and again, "the negotiations for the sale of the property to the Oregon Wool and Scouring Mills Company was hanging fire from approximately the first of April, 1916, until the middle of October, 1916, or perhaps later, waiting for Mr. Lind * * to do something."

In the October letter the Kenwood Company notified Lind, as president of the Westrumite Company, to remove the machinery, boilers, and fixtures "from the building formerly occupied by you," and "in case you do not do same within three (3) days from this date we will remove them, and store such as can be stored in the rear of the Safe Works building, subject to your order, upon payment of the cost of removal." The defendant contends that the building was entered by thieves and some of the property stolen before the Wool Company stored its machinery in March or April, 1916, and that whatever property was removed after March, 1916, was removed by the Wool Company, and that therefore, if there is any liability at all, it attaches to the Wool Company, and not to the defendant.

Lind says that not until June or July, 1916, did he discover that any of the property had ever been interfered with, and that at that time, upon going to the building, he found that certain articles had been removed, and "the locks we had on there were taken off, and another lock put on the big door." While Lind says that he had no knowledge of Keeler having a key to the building, and Keeler states that he does not recall of having given a key to W. L. Crowe, the president of the Wool Company, nevertheless Crowe

testified that, when he first went to the building "Mr. Keeler gave me a key when I got in." Lind stated that sometime "during the summer" of 1916, he saw Heusner and talked with him about selling the property to certain prospective purchasers, and when—

"I was explaining to him about throwing the stuff out," Heusner "said it was entirely out of his hands; that the company [Kenwood Company] was doing it themselves, through Mr. Keeler or somebody who had charge of it."

Crowe claims that the Wool Company did not disturb any of the property in the building at the time he stored the machinery in the spring of 1916; but there is evidence in the record from which the jury could have inferred that some of the property had been removed from the building, as related by Lind, at some time prior to June or July. Crowe admits, however, that on October 13th, the Wool Company began the work of removing all the property then remaining in the building. Turning to the October letter written by the Kenwood Company, it will be observed that it is dated October 14th, the day after the Wool Company began to remove the property; and it will also be noted that in this letter the Kenwood Company advises Lind that, if he does not remove the property within three days, "we will," although the Wool Company was at that very moment actually engaged in removing the property. Crowe testified that the work of removal was done by the Wool Company "at the instigation or with the consent of the Kenwood Land Company"; and when asked: What officer of the Kenwood Company "talked with you or gave you instructions to the effect that things should be removed?" he answered: "Both Mr. Heusner and Mr. Keeler."

1. The evidence relied upon by the plaintiff is sufficient to accomplish more than to suggest a suspicion or possibility; and, although there was evidence tending to support the theory of the defendant, and to contradict the position taken by the plaintiff, still the evidence relied upon by the plaintiff was sufficiently substantial to enable reasonable men to reach the verdict returned by the jury; and, therefore, we are prohibited from disturbing the verdict, even though we might, if we were authorized to review the evidence, reach a different conclusion as to the facts: *Schneider* v. *Tapfer,* 92 Or. 520, 546 (180 Pac. 107).

The defendant insists that the plaintiff has failed to prove the dissolution of the Westrumite Company. The statutes provide that, if a corporation "for two consecutive years" fails to pay the prescribed license fees, the corporation commissioner shall, on or before the first Monday in January, report that fact to the Governor, and "the Governor shall forthwith issue his proclamation declaring such corporation dissolved," and the proclamation of the Governor must then be filed in the office of the corporation commissioner: Sections 6716, 6717, 6718, L. O. L.; Section 8, Chapter 341, Laws 1913. These statutes, as stated by the defendant, contain three essentials: (a) Failure to pay license fees for two consecutive years; (b) report by the corporation commissioner showing the delinquency of the corporation; and (c) proclamation by the Governor declaring the dissolution of the corporation. These three essentials are sufficiently pleaded in the complaint to meet the requirements of the rule announced in *Dowd* v. *American Surety Co.,* 69 Or. 418 (139 Pac. 112); but the defendant contends that there is no competent evidence to show that the corporation com-

missioner reported the delinquency of the corporation to the Governor, The record contains direct evidence that the license fees were not paid, for Lind testified that the fees for the years 1914 and 1915 were not paid. The fact that the Governor issued a proclamation of dissolution on January 11, 1916, is shown by a certified copy of a proclamation signed by the Governor and filed with the corporation commissioner on January 11, 1916. The proclamation issued by the Governor opens by reciting that the corporation commissioner "did, on the 3d day of January, 1916, report to me, as the Governor of the state of Oregon, a list of all of the corporations organized under the laws of the State of Oregon, for gain, which, for two consecutive years or more next preceding the said 3d day of January, 1916," have failed to pay the license fees required by law; and it is also recited in the proclamation that the report of the corporation commissioner contains the name of the Westrumite Company.

2. The plaintiff contends that evidence of the making of the report by the corporation commissioner is found in the presumption that official duty was performed, not only by the corporation commissioner but also by the Governor. In other words, this contention involves the argument that, since it is directly shown that the fees were not paid, it must be presumed that the corporation commissioner performed his official duty by making the report, and that since the Governor did in truth issue a proclamation, it is to be presumed that he did so only after receiving the report from the corporation commissioner, for the reason that without such a report he had no authority to issue a proclamation. It is not necessary, however, to decide whether the doctrine of presumption of performance of official duty is applicable (see

97 Or.—3

*Davis* v. *Chamberlain,* 51 Or. 304, 310 (98 Pac. 154);
*Stephenson* v. *Von Blokland,* 60 Or. 247, 253 (118
Pac. 1026); *Reiff* v. *Portland,* 71 Or. 421, 431 (141
Pac. 167, 142 Pac. 827, L. R. A. 1915D, 772), for the
reason that the recitals in the proclamation are
*prima facie* evidence of the filing of a report by the
corporation commissioner.

The proclamation issued by the Governor is a pub-
lic document. The statute expressly commands the
Governor to issue a proclamation when the corpora-
tion commissioner makes the report required of the
commissioner. The report of the commissioner is
the basis of the Governor's proclamation. The re-
citals appearing in the proclamation are official state-
ments of facts, and unless the facts so stated actually
existed the proclamation would be ineffective. The
facts recited in the proclamation are the facts which
create the duty of issuing the proclamation, and
consequently the recitals concerning the corporation
commissioner's report are official statements, which
constitute *prima facie* evidence that the corporation
commissioner filed a report showing the delinquency
of the Westrumite Company: Section 768, L. O. L.;
3 Wigmore on Evidence, § 1630 et seq.; 4 Enc.
of Evidence, 841; 10 R. C. L. 1126; 22 C. J. 801.

3. The next point urged by the defendant is that
the complaint does not sufficiently show that the
plaintiff had a right of action, for the reason that
the pleading does not aver payment of all the cor-
porate debts; and it was also forcibly and ably ar-
gued at the hearing by counsel for the defendant
that, since it affirmatively appears from the evidence
offered by plaintiff himself that the purchase price,
interest, and taxes provided for in the land sale con-
tract are still unpaid, the plaintiff has failed to prove
a right of action. Regardless of whatever the rule

may have formerly been, it is now a well-established doctrine that the property of a corporation, including rights of contracts and choses in action, upon dissolution of the corporation, become vested in the stockholders, subject to the rights of creditors; and ordinarily, and in the absence of debts, the stockholders, upon dissolution of the corporation, become the owners of its assets: 5 Thompson on Corporations (2 ed.), §§ 6585, 6587, and 6589; *Service Lum. Co.* v. *Sumpter Valley Ry. Co.*, 81 Or. 32, 50 (149 Pac. 531, 152 Pac. 262, 158 Pac. 175); *Baldwin* v. *Johnson*, 95 Tex. 85 (65 S. W. 171); *Gasque* v. *Ball*, 65 Fla. 383 (62 South. 215); *Stearns Coal & Lumber Co.* v. *Van Winkle et al.*, 221 Fed. 590 (137 C. C. A. 314).

In addition to contending that the complaint is sufficient to meet the objection of the defendant, and that the evidence shows that there were no debts, the plaintiff argues that the complaint avers and that the evidence shows actual possession by the stockholders at the time of the alleged wrongful removal of the property, and that therefore such actual possession is of itself and alone enough to permit the maintenance of this action, even though it be assumed that the legal as distinguished from the equitable title is not yet vested in any of the stockholders on account of some outstanding debt due from the Westrumite Company, and to sustain this contention the plaintiff cites the following authorities: *Stowell* v. *Otis*, 71 N. Y. 36; *Wheeler* v. *Lawson*, 103 N. Y. 40 (8 N. E. 360); *Cuttner et al.* v. *Pacific Steam Whaling Co.* (D. C.), 96 Fed. 617. However, we shall pass this phase of the controversy; and, after noticing the language of the complaint, we shall endeavor to ascertain whether it can be said from a consideration of the evidence that there is any debt owing from the Westrumite Company. For the purposes of the in-

stant case we shall assume, without deciding, that in no event can stockholders of a dissolved corporation prosecute an action like this one, unless at the time the action is brought all the corporate debts have first been paid. The complaint tells about the failure of the corporation to pay the required license fees, the report of the delinquency, and the Governor's proclamation dissolving the Westrumite Company; and then appears the following allegation:

"That prior to and at the time of said dissolution of said Pacific Coast Westrumite Company the sole stockholders of said corporation were William Lind, Fred J. Blakeley, and the plaintiff herein, Harry Howard, and that by reason of said dissolution all the property and property rights of said corporation devolved upon and became the property of the said William Lind, Fred J. Blakeley, and the plaintiff."

4. We think this averment is sufficient after verdict and in the absence of a demurrer. It is true that there was a motion for a nonsuit and a motion for a directed verdict; but the language used in both motions was general, and attention was not directed to the specific question now under consideration.

The uncontradicted testimony is that all the debts of the Westrumite Company have been paid except the debt, if there is a debt, created by the land sale contract. If the writings concerning the land have not already created a debt, and if on account of what has occurred they cannot in the future create a debt, then it is accurate to say that there are no corporate debts, and that therefore the legal title to the corporate assets passed to the stockholders upon the dissolution of the corporation. The grievance of the plaintiff, as related in the complaint, is rested upon two grounds: The one, that the removal whether rightful or wrongful, was negligently done; the other,

that the removal was wrongful. Noticing only that aspect of the complaint which deals with the charge of wrongful removal, we find the plaintiff saying that the defendant, without the consent of the stockholders of the Westrumite Company then in possession of the property, wrongfully entered upon the premises and wrongfully removed the personal property; and we find the defendant saying in its answer that it rightfully took possession of the premises by selling to the Wool Company, and that what it did was rightful because done after giving 60 days' notice. In effect the defendant has admitted in its pleading that it had no right to take possession of the property unless it first gave 60 days' notice. It is true that the land sale contract obligates the seller to convey and the purchaser to pay; but it is also true that failure to pay does not alone and by its own force create a debt owing from the purchaser. By the express terms of the contract, the seller is given two alternatives from which to choose; and while the Kenwood Company would have chosen either one of the two, it could not and cannot choose both. The Kenwood Company could have treated the land as sold and then sued for the purchase price; but it did not so choose. On the contrary the defendant elected to retake possession of the land, and by so doing precluded itself from treating the land as sold and from recovering the purchase price as a debt.

5. In its answer the Kenwood Company alleges that it contracted to sell to the Wool Company, and that the Wool Company entered into possession of the premises. There is no debt owing to the Kenwood Company on account of the land sale contract; the choice of alternatives made by the Kenwood Company prevents the creation of a debt at any time in

the future; and consequently the legal title to the assets of the Westrumite Company passed to the stockholders upon the dissolution of the corporation.

We do not attempt to decide whether a strict foreclosure of the contract is necessary in order to extinguish any equity the stockholders of the Westrumite Company may have in the land. It is sufficient to say that, if such a suit is necessary, it cannot terminate in a personal judgment or decree for money enforceable by execution or otherwise.

The conclusion that the Kenwood Company elected to retake possession of the land is not inconsistent with a finding by the jury that the property of the Westrumite Company was wrongfully removed. If the notice of March 23d was waived, then any property removed before June or July, the time when Lind says that he first discovered that part of the property had been removed, was wrongfully removed. Indeed, the very fact that an additional notice was sent on October 14th is some evidence that the defendant itself regarded the March notice as having been waived. The undisputed testimony is that the Wool Company began to remove the remaining contents of the building on October 13th, and that the work continued until the building was cleaned out. In other words, assuming that the March notice had been waived, and that it was therefore inefficient, the Wool Company began to remove the property 61 days before the Kenwood Company was entitled to take possession of the premises.

6. Treating the notice of October 14th as a notice given under the contract, the right of possession was in the process of development from the date of the notice, but it did not mature until the expiration of 60 days. The Kenwood Company did not wait for the maturity of the right of possession, but some

and probably the most part of the property was removed before the maturity of the right.

It follows from what has been said that the judgment must be affirmed.                    AFFIRMED.

McBRIDE, C. J., and BENSON and BURNETT, JJ., concur.